**THEROZ CO. v. UNITED STATES INDUSTRIAL CHEMICAL CO., Inc., et al.**

(District Court, D. Maryland.    September 7, 1926.)

**1. Patents ⟨⟩328.**

Schaub patents, 1,262,267, claims 1, 3, 4, 5, 6, 10, and 1,262,268, claims 1 and 3, for solid alcohol fuel and process of solidifying same, *held* valid, unanticipated, and infringed.

**2. Patents ⟨⟩18.**

Simplicity of process or means whereby an old and vexing problem is solved does not negative invention or show that it was obvious to persons skilled in art.

**3. Patents ⟨⟩173.**

Inventor first producing a useful result should not be confined to precise method of manufacture described in his claims.

**4. Patents ⟨⟩236.**

Where form and substance are separable and whole substance of patent may be embodied in different form, courts, to protect inventor, will look through form to substance of invention.

**5. Patents ⟨⟩120.**

Second patent by same patentee, claims of which might well have been added as additional claims to first, is not invalidated by application for first.

**6. Patents ⟨⟩239.**

Mere addition of another ingredient to ingredients specified in patentee's claims does not avoid infringement.

**7. Patents ⟨⟩179.**

Where disclosure of patent is sufficient if addressed to one skilled in the art, patentee will not be confined to specific substances or ingredients which his specifications declare preferable.

**8. Patents ⟨⟩17.**

That inventor did not understand scientific principles underlying his invention does not affect his right to patent.

**9. Patents ⟨⟩328.**

Brigham patent, 1,313,876, relating to solid alcohol fuel, *held* invalid for lack of invention.

In Equity. Suit by the Theroz Company against the United States Industrial Chemical Company, Incorporated, and another. Decree for plaintiff.

Gifford & Scull, of New York City, for plaintiff.

Mayer, Warfield & Watson, of New York City, for defendant U. S. Industrial Chemical Co., Inc.

G. Willard Rich, of New York City, for defendant Sterno Corporation.

SOPER, District Judge. The Theroz Company brings this suit against United States Industrial Chemical Company, Incorporated, and Sterno Corporation, charging infringement of certain patents, and praying an injunction and an accounting for profits. The patents in suit are those to Jacob Schaub, No. 1,262,267, issued April 9, 1918, on application filed July 17, 1917; Jacob Schaub, No. 1,262,268, issued April 9, 1918, on application filed October 4, 1917; and Howard Brigham, No. 1,313,876, issued August 26, 1919, on application filed February 23, 1918. They will be called for convenience the first Schaub, the second Schaub, and the Brigham patent. Each relates to a composition of matter or product called solid alcohol, and to a process

for its manufacture. The plaintiff's article is known and sold as Theroz Fuel, while the article alleged to infringe the patents is manufactured by United States Industrial Chemical Company and marketed by Sterno Corporation under the name of Sterno Canned Heat.

Solidified or solid alcohol, so called, for use as fuel, has been known commercially for a considerable period. The combustible liquid is not in fact solidified, but is inclosed in the pores or cavities of a solid substance which serves as a supporting sponge or framework. Prior to 1900, the framework of the commercial article consisted generally of a spongy soap holding a certain amount of liquid in its pores, and retaining it if kept in air-tight boxes. Such a product was extensively marketed by the Sterno Corporation between 1914 and 1920, as will appear from the opinion of Judge Mayer in S. Sternau & Co., Inc., v. George Borgfeldt & Co. (D. C.) 254 F. 582. But the soap product was subject to certain defects. Denayrouze pointed out in the specification of his British patent No. 17,687 of 1900, for the "manufacture of solidified carburetted spirits for heating or lighting purposes," that there were three objections to the soap product: (1) During combustion, the soap melts and the alcohol spreads at the bottom of the burning piece and often produces extended flames which may become disagreeable and dangerous; (2) after combustion of the compound, there is an abundant and objectionable residue; (3) after a time dessication of the compound takes place, causing loss of weight and reduction of combustibility. Denayrouze overcame these objections by inclosing the liquid in a fine net work of nitrocellulose or pyroxylin, and this substitution of a combustible for an incombustible but fusible substance formed a solid alcohol which burned without fusing and without substantial residue. For this purpose, nitrocellulose was dissolved in a mixture of ether and alcohol, and the mixture was then solidified by the gradual evaporation of the ether.

A very similar process is covered by United States patent to Poulton, No. 1,299,408, which was granted April 1, 1919, upon an application filed April 16, 1915. Indeed it is not easy to distinguish the Poulton process or product from that of Denayrouze. Poulton also used a solution of pyroxylin in ether and alcohol. The solution was subjected to a moderate temperature above the boiling point of ether, but below the boiling point of alcohol, whereby the ether was gradually but only partially vaporized. The mixture was then allowed to stand for a period, whereupon solidification took place. Obviously these processes depended upon the power of ether to dissolve or aid in the solution of nitrocellulose, and, since solidification took place only when the ether was at least partially removed, the loss of ether or some ancillary process to recover it entailed considerable expense. Moreover, the risk of fire in the manufacture was increased and the odor of ether in the finished product was noticeable and offensive. Poulton called his product Sol-a-Kol, and attempted to market it, but without success. The defendants claim that his failure was due to lack of funds to conduct the business and to business misfortunes. How accurate this explanation may be it is not necessary to determine, for Sterno Corporation purchased the patent from the creditors of the bankrupt Poulton Company in 1918, but never adopted the process, and the reasonable conclusion is that the use of ether is attended by consequences which make the process inferior to that which the defendants actually employ.

In 1916, Jacob Schaub, the patentee, was an employee of the plaintiff as a mechanical expert. He had had little or no scientific education, but was possessed of some skill in the handling of machinery, and had had some little experience with nitrocellulose solutions in handling lacquers, etc. The plaintiff company at that time was endeavoring to produce a solid alcohol by the ether alcohol process, under the direction of one Clover. It was a complete failure, notwithstanding the expenditure of a sum in excess of $50,000. Schaub had been employed by Clover to make dies and tools and to prepare for the manufacture of bottle warmers and stoves which would be required when the alcohol fuel should be perfected. When it became clear that the main operation had failed, Schaub began making experiments to see if he could improve the product, and as early as December, 1916, he had made such progress that the company retained him, and on January 4, 1917, released Clover from its employment. Schaub's idea was that something should be found to replace the ether collodion so that there would be no evaporation or loss of this substance. Making use of the facts well known to the art, that nitrocellulose is soluble in commercial methyl alcohol, and that such a solution may be coagulated by ethyl alcohol containing from 5 to 10 per cent. of water, he succeeded in developing a process which was free from the defects of both the soap and the ether alcohol nitrocellulose methods, and which retained in the finished product all the ingredients used in its manufacture. In the

summer or fall of 1917, the perfected article was placed on the market, and during the great war all of the output was purchased by the United States.

As already stated, Sterno Corporation achieved considerable success in the sale of a solid alcohol containing a framework of soap in the years 1914 to 1920. In November, 1920, this product was abandoned, and the defendants began the manufacture and sale of an article under the same name, "Sterno," made without the use of either soap or ether, and so similar to Theroz in ingredients, in properties, and in mode of manufacture as to give substance to the charge of infringement of the patents in suit. A war of prices ensued until Theroz, which brought 34½ cents a pound in 1920, was selling below cost at 12 cents a pound at the time of trial in 1925. At this point the plaintiff company made no further reduction of price, but permitted the defendants to get the business.

Two facts are abundantly proved by the testimony: (1) That the Schaub method is a substantial practical improvement upon the solid alcohols theretofore produced and patented, and (2) that Sterno, in its freedom from soap and ether, and its adoption of the solvent power of commercial methyl alcohol and the solidifying power of water, resembles more nearly the plaintiff's goods than any other ever produced. Indeed the manufacture of solid alcohol in the United States is now confined to the parties to this litigation. It is for the court to decide whether the patents in suit, in the first place, are valid patentable inventions, and, secondly, whether the claims of the patents are infringed by the defendants.

[1] The defendants set up both anticipation and lack of invention as invalidating the patents in suit, but, since substantially the same references are cited in support of both defenses, they may be considered together. The first Schaub patent declares the object of the invention to be to produce an artificial fuel easily ignited, rich in heat units, that does not fuse while burning, and leaves a minimum of residue when consumed. For this purpose 4 parts of nitrocellulose are dissolved in 46 parts of commercial methyl alcohol. Then a sufficient quantity of commercial ethyl alcohol (usually 12 parts), containing 5 to 10 per cent. of water, is added to bring the colloid to the desired viscosity. The colloid may then be transformed into a solid jelly by the addition of more ethyl alcohol, but preferably the colloid is formed into a tubulous mass and the tubules are filled with ethyl alcohol. The method by which the tubules are formed and filled with the coagulating liquid is an important part of the invention. The liquid is squirted or injected into the colloid so as to form cavities, which are roughly tubular in form when produced by a machine such as is shown in the drawing accompanying the specifications. A nozzle or spray head is used, consisting of numerous small tubes through which the liquid is introduced, while at the same time the colloid is forced down around and between the tubes, so that at the end of the tubes the colloid and the liquid, flowing in parallel streams, unite in an intimate mixture. Coagulation results, and there is produced a supporting framework of nitrocellulose, in the pores of which and in the tubular cavities produced as described, is found the combustible liquid. The product may be run into moulds and cut into cubes of suitable dimensions, or, as actually manufactured by the plaintiff, the product may be run directly into cans for use. The evidence clearly shows the advantages of this product and process. The use of soap, with its fusibility and objectionable residue, is avoided. The use of ether, with its fire risk, its objectionable odor, and loss by evaporation, is likewise eliminated. The final product contains not only the nitrocellulose, but also the liquid used as a solvent, and the liquid used as a coagulant, both of which are themselves combustible. In short, the final product contains all the ingredients which enter into its manufacture.

The experts are agreed that, as used in the Schaub process, the solvent power of commercial methyl alcohol is due to the presence of acetone as an impurity, and the coagulating power of commercial ethyl alcohol is due to the presence of water. It is clear that Schaub was not the first to discover these facts or to make use of them; nor was Schaub's product the first solid alcohol, consisting of nitrocellulose and combustible liquids, as the following citations will show:

Worden's Nitrocellulose Industry (1911) pp. 47 and 48, speaking of variations in solubility and viscosity of nitrocellulose and commercial preparations of nitrocottons for films and lacquers, says that the solvent for technical use commonly employed was not a mixture of ether and alcohol, as indicated by the literature, but amyl acetate and commercial wood alcohol containing acetone. He shows also (page 166), that the solvent power of commercial methyl alcohol is due to the presence of a small amount of acetone present as a normal impurity, and that the most important property of acetone in connection with nitrocellulose is its power to increase the powers of inert and comparatively weak sol-

vents—specifically methyl alcohol and ethyl alcohol—and that the value of acetone as a solvent is in proportion to its freedom from moisture. Anhydrous ethyl alcohol is a solvent of the lower nitrocelluloses (page 182); its solvent power rapidly decreasing with the use of water so that 95 per cent. alcohol is practically a nonsolvent of all cellulose nitrates.

Worden's Technology of Cellulose Esters (1916) p. 2890, discussing solidified spirits or alcohol, states that in recent years a number of preparations have been introduced which, added to ethyl alcohol, cause the entire mass to solidify in a sufficiently firm condition to be cut into cubes about one inch in diameter. He speaks of soap and paraffin combinations and their disadvantages; of the cellulose nitrate combinations of Denayrouze and others, involving the use of ether. In addition he mentions a cellulose acetate product which was subject to still other serious defects from which Theroz and Sterno are conceded to be free. He himself suggests as a remedy a combination of nitrocellulose and cellulose acetate, but this too was subject to the objection of fusibility. This could be avoided by distillation of part of the alcohol, a method which, like the ether process, was defective, since it involved a removal of part of the ingredients.

Duncan, in his Chemistry of Commerce (1907) p. 146, mentions a solid alcohol called Smaragdin, which consisted of alcohol with a little ether soaked in a harmless form of gun cotton, an illustration of a product in which the nitrocellulose, like a sponge, holds the inflammable material.

The Denayrouze British patent of 1900 has already been mentioned. He overcame the defects of the soap product by substituting nitrocellulose for soap as the container. The alcohol was inclosed in particles of nitrocellulose by pouring ether alcohol collodion into alcohol or by dissolving nitrocellulose in alcohol having ether added to it. In either case the ether was evaporated slowly, whereby the compound took the form of a jelly which could be cut into shapes. All of the ether was not evaporated, but, at a stage of the evaporation, the residue was brought to a point where it was no longer a solvent for the nitrocellulose and precipitation took place so that some of the ether remained in the final product. The patent disclosed a solid alcohol having nitrocellulose as a sponge or framework. It showed how to get the nitrocellulose in solution and dispersed throughout the alcohol, and how to precipitate the mixture by a removal of part of the solvent.

Doubtless also the water in the alcohol served to coagulate the mixture when a part of the ether was evaporated. But the composition of the product was not the same as Schaub's, nor was the process the same, in that it involved the use of ether and the removal of a part of it, whereas Schaub omitted ether and retained his solvent in the ultimate product.

The disclosures of Poulton were substantially similar to those of Denayrouze. Poulton also described the objections to soap, and declared he had overcome them by a combination of pyroxylin, ether, and alcohol. The ether is added to the pyroxylin, and the mixture is allowed to stand for 15 minutes, and then alcohol is added to the mixture, and the mixture shaken until the pyroxylin is dissolved. Then additional denatured alcohol is added, and the liquid is heated to a point above the boiling point of ether and below the boiling point of alcohol, whereby the ether is partially vaporized, and, after standing, the mixture thoroughly solidifies. Poulton says that the action which takes place may be described as first forming a solution of pyroxylin, diluting this solution so as to reduce the percentage of solvent, whereby the pyroxylin coagulates in the presence of the liquid fuel and the latter is held by the coagulated pyroxylin. By the use of ether, the reduction of the solvent is aided by the evaporation of the volatile ingredient and the use of such an ingredient is preferable. He says that the diluent action of the water is to be kept in mind. Where denatured alcohol is used, the alcohol and water contained therein are advantageous, the wood alcohol, aside from its solvent power, having a higher oxygen content than the grain alcohol and therefore aiding combustion, while the water in the denatured alcohol assists in the dilution of the mixture and the consequent coagulation of the pyroxylin. The pertinent disclosures are obvious, to wit; a solid alcohol consisting of nitrocellulose, ether, and denatured alcohol containing methyl alcohol and water, a product which is infusible and burns without residue. The solvent power of methyl alcohol and the coagulant power of water are also disclosed, but the patent does not show how to get along without ether and the loss of it in the process of manufacture. There are consequently involved the disadvantages of expense, fire risk, and objectionable odor already described.

The British patent to Haddon of 1907 is specially emphasized as showing, not only a lack of patentable invention in Schaub, but as actually anticipating his patents. The Haddon patent related to a process for making collodion filaments, artificial silk, horse

hair and the like. Haddon declared that the process is based upon a reaction which allows of instantaneously solidifying a filament of concentrated collodion discharged from a small orifice without altering its shape, dimensions, or chemical composition. The collodion is forced through an aperture in the form of a cylindrical thread of minute size, and enters a receptacle containing the coagulating liquid where the thread is solidified. The coagulant may contain one of the solvents of nitrocellulose with a slight addition of water so calculated that the solvent just ceases to act as such. For instance, a concentrated solution of nitrocellulose and methyl alcohol is solidified by contact with alcohol of the same kind containing 5 to 8 per cent. of water. When the thread is solidified in the coagulant, it may be wound upon a suitable apparatus. It is then dipped into pure water to remove all the soluble substances, is then placed in baths containing suitable denitrating and decolorizing agents, and is finally dipped again in water and removed in a clean and incombustible state.

The defendants claim that this process deals broadly with the use of alcohol and nitrocellulose with solvents to disperse the nitrocellulose through the alcohol and gelatinizers to precipitate the nitrocellulose into a sponge to hold the alcohol. Moreover, it is claimed that, at a certain stage in the manufacture, the product strikingly resembles the solid alcohol of Schaub. When the collodion enters the coagulant and is solidified, it contains nitrocellulose and methyl alcohol and is combustible. It is urged that the only change necessary to make this substance a suitable solid alcohol is to decrease the proportion of nitrocellulose and increase the proportion of the alcohol in the solution, so that if the process is stopped at this point, a combustible solid alcohol is obtained which contains all the ingredients used in the manufacture. But it is clear that the purpose of the process is to recover a fine thread entirely free from the combustible solvent employed. Hence the purposes of the artificial silk maker and the solid alcohol maker are directly the reverse of each other. The differences from the Schaub process are clear. In Schaub the coagulant is injected into the colloid and remains in it, while in Haddon the colloid is forced into the coagulant which at no time becomes a part of the product. Similarly Schaub retains all of the solvent in the final product, while Haddon dissolves the cotton merely to obtain a threadlike filament and ultimately eliminates all of the solvent therefrom. While the Haddon process at one stage produces a substance that is a solidified mixture of alcohol and nitrocotton, nevertheless, having regard for the contrary purposes and results of the processes, the extremely small size of the filament and the high proportion of the nitrocellulose therein, the process cannot be said to amount to a demonstration of a successful method of making a practicable solid alcohol.

Finally, the defendants bring home in striking fashion the fact that Schaub utilized familiar natural laws in his invention by producing as witnesses Flaherty and Davenport, two employees of corporations subsidiary to the E. I. Dupont de Nemours Company. These men were industrial chemists, skilled in the nitrocellulose art. In March, 1917, after Clover had left the plaintiff company, they were called in by it to confer about the recovery of ether lost in the Clover process. They suggested to employees of the company, Schaub being present, that the use of ether as a solvent be eliminated from the process, and that acetone, or, as a cheaper substitute, an industrial grade of methyl alcohol containing acetone, be substituted. They also suggested that denatured ethyl alcohol containing water be added to get a jelly, saying that, if water were added, the solidification would take place more quickly. They also declared that the use of denatured alcohol would increase the heat units of the product.

They testified further that all of these suggestions were based on facts well known to workers in the art, as the citations hereinbefore discussed, demonstrate. No advice was given by these experts as to how the coagulant should be applied. Indeed, they had never made solid alcohol, and had no practical experience in the matter; the Dupont Companies making no product in which it used water purposely to produce a jelly. Indeed, their problem and concern had been to keep their solutions free from moisture so as to prevent coagulation. But the Dupont Companies at that time were interested in the so-called Arlington method for making solid alcohol which was covered by patent. The details of the Arlington method are not disclosed by the testimony, and it is material only as showing that this great company was also experimenting, without apparent practical result in this branch of the art. The chemists reported to their employers their visit to the plaintiff's plant and the report was considered by officials of the companies in connection with the Arlington patents.

Shortly after this visit, the Dupont Company sent a sample of the collodion recommended by them, and, after the Schaub pro-

cess was perfected, the Theroz Company (or the Basic Products Company as it was then called), purchased considerable quantities of materials from the Dupont Company during the years 1917 and 1918. The purchases from the Dupont Company were then suspended until late in 1920 or early in 1921. There is no denial of any of this testimony, but it is not admitted by the plaintiff that the information conveyed was new to Schaub. Before the trial, the plaintiff notified the defendants that the Schaub discovery was made in December, 1916. In that month Schaub began to experiment, hoping to find a substitute for ether so that there would be no evaporation, and whatever entered into the manufacture would remain in the final product. The experiments were kept secret from Clover, and before he left on January 4, 1917, some progress had been made and reported to officers of the plaintiff company. Prior to 1916, Schaub had made use of methyl alcohol to dissolve lacquers, and hence he was led to try it again as a solvent of nitrocellulose. He found by experiment that he could gelatinize such a solution by the use of water. Crude experiments on a small scale were shown by him to officers of the company. The difficulty was to find a method for the application of the water. It was a delicate thing to get it in evenly so that the framework of nitrocellulose would support the alcohol. Three or four months passed before an apparatus was perfected in March, 1917, to make the substance. The product was put on the market in July, 1917. The application of the first patent was filed on July 17, 1917.

Considering that as late as March 8, 1917, the Dupont employees were called in to confer about the recovery of ether, and to inspect the elaborate machinery provided in the Clover plant for the ether alcohol process; that the suggestions that solid alcohol might be made with methyl alcohol as a solvent and ethyl alcohol and water as a coagulant, were received with apparent surprise, and that the application for the first patent was not filed until July 17, 1917, it is a plausible argument that Schaub discovered nothing, but based his process and patent on the information so freely furnished. But, on the other hand, Schaub had already begun his experiments, and, in any event, the information conveyed to him by the chemists was only that which was well known to workers in the art. Especially it should be borne in mind that there was no suggestion as to how water should be added, for, after all, it was the employment of the injection method which made the Schaub method a success. The experts agree that, if the

water is simply placed on top of the mixture, some of the alcohol will diffuse into the water, and complete solidification will not take place.

Summing up the revelations of the prior art, it is clear that commercial methyl alcohol was commonly employed as a solvent for nitrocellulose; that its solvent power was known to be due to small quantities of acetone present as a normal impurity; that the most important property of acetone in connection with nitrocellulose is its capacity to increase the solvent power of methyl alcohol and ethyl alcohol; that the value of acetone as a solvent for nitrocellulose is in proportion to its freedom from water; that anhydrated alcohol is a solvent for the lower nitrocelluloses; and that water is a coagulant for a nitrocellulose solution. More specifically, the prior art disclosed the manufacture of solid alcohol containing alcohol as a fuel with some substance as a framework, particularly soap or nitrocellulose. In the case of the nitrocellulose, the art was familiar with a process by which the nitrocellulose was dissolved and thereby dispersed throughout the combustible alcoholic fuel, followed by a precipitation of the nitrocellulose by a removal or counteraction of the solvent. There was also the disclosure that at one stage of the Haddon process an inflammable solid substance of threadlike proportions, consisting of nitrocellulose and methyl alcohol, was produced.

[2] All of these disclosures the plaintiff answers with the undeniable claim that in all the prior art there was not a single instance of the solution of nitrocellulose by a liquid where both the solvent and the coagulant were retained in the final product, nor a single case where either the solvent or the coagulant was so retained, nor a single case where the coagulant was added to the colloid by injection. These are characteristics of the Schaub patent and give it great advantages, which result not only from the preservation of all of the ingredients in the final product, but from the simplicity of the method of manufacture. Schaub's idea was a simple and complete solution of the problem that the art had been considering for many years, and it was close at hand. But was it obvious to persons skilled in the art? If so, as the plaintiff pertinently inquires, why did not Worden, the foremost expert in nitrocellulose solutions, or Duncan, or Denayrouze, or Poulton, or the Dupont Company, discover it and disclose it to the world? To bring the problem home to the parties in this suit, why did not the Sterno Corporation, which has been the most active dealer in solid alcohol in this country since 1914, introduce this useful improvement

in the manufacture of its product. None of these experts and practical men made the discovery, although vitally interested in the problem, and it follows that their failure was due to lack of the inventive ability on this particular point which the patentee possessed. Diamond Rubber Co. v. Consolidated Tire Company, 220 U. S. 434, 31 S. Ct. 444, 55 L. Ed. 527; Eibel Process Co. v. Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523.

Considering next the specific claims of the patent in issue, it will be seen that the discovery was sufficient to support them. The first claim of the first Schaub patent is as follows:

"1. An artificial fuel consisting of cellulose, having a nitrogen content, which renders it soluble in methyl alcohol, methyl alcohol and ethyl alcohol, substantially as described."

This is obviously a claim for a composition of matter, and accurately describes the ingredients of the finished product. The history of the art, as above disclosed, demonstrates that the use of nitrocellulose as a framework, itself inflammable, and the use of alcohol as a combustible fluid, in combination with the framework, was well known. The difficulty, however, had been to make a proper solution of the cellulose so that, when it should be precipitated in the next step in the process of manufacture, it would be dispersed throughout the liquid, and able, therefore, to give it adequate support. Up until the time of Schaub's invention, the solution best adapted to this end was the ether alcohol process and the finished product thereof included not only cellulose and alcohol, but also ether, and was therefore a process not only different from the Schaub process, but the composition of the final product also differed in an essential particular.

As already shown, the two best known ether alcohol processes were covered by patents to Denayrouze and Poulton. There was also the attempt of Clover to develop a similar process for the plaintiff company. In all of these processes, ether was not only used in the course of manufacture, but was partially retained in the final product. The experts in the case at bar are agreed on this point with regard to the Denayrouze process, and that process was substantially similar in all respects to those of Poulton and Clover. The only indication in these processes of the possibility of a solid alcohol without ether as a constituent is contained in the following statement from the Poulton specification:

"If desired, practically all the ether may be driven off, in which case there results a pasty mass which is completely combustible and which will not liquefy."

There is no evidence to indicate the practical efficiency of such a product as a solid alcohol, or that in fact it was ever made. Persons engaged in the manufacture of the Poulton product were examined and made no claim that all the ether was eliminated, but, on the contrary, stated that evaporation took place only until a certain consistency was reached. The literature of the art clearly shows that gelatinization of such a nitrocellulose solution takes place as soon as the solvent power of the mixture is reduced by a removal of a part of the solvent to a point where the power of the solvent which remains is counteracted by the coagulant present. In short, the quoted statement from the Poulton specification, in face of the entire evidence, does not warrant the finding that Poulton had found the way to make a solid alcohol free from ether. This conclusion is fortified by the action of the Sterno Corporation, the owner of the Poulton patent. This defendant filed with its answer a counterclaim wherein it charged that the plaintiff company, by its manufacture of Theroz, had infringed the Poulton patent, but at the trial the Sterno Corporation abandoned this position, and dismissed its counterclaim. While the prior art makes it clear that solid alcohol, consisting only of nitrocellulose and alcohol, was a desirable result, it remained for Schaub to achieve this result and to produce for the first time a product containing only these materials.

[3] The question may arise, in view of the prior art, whether the patent in controversy should be limited to the product produced by the processes therein described. It is true, as will hereafter appear, that the defendants have infringed all of the claims in issue, whether the claims are given a broad interpretation for the final product, however produced, or are confined to the product produced as described in the specification. But the patentee was the first to achieve what had been realized as desirable, and he is entitled to a patent for the product as set out in the claim, for it is the duty of the court to avoid, if it reasonably can, a construction confining the patent to the precise method of manufacture which it describes. General Electric Company v. Laco-Philips Co., 233 F. 96, 147 C. C. A. 166; Dunn Wire-Cut Lug Brick Co. v. Toronto Fire Clay Co., 259 F. 258, 170 C. C. A. 326.

The remaining product claims of the first Schaub patent are as follows:

"3. An artificial fuel comprising in com-

bination a tubulous envelope of combustible material, and a combustible liquid inclosed in the tubules of the envelope.

"4. An artificial fuel comprising in combination a tubulous envelope of combustible material which will not fuse while burning and a combustible liquid inclosed in the tubules of the envelope.

"5. An artificial fuel comprising in combination a tubulous envelope of combustible material which will not fuse while burning, the tubules in the envelope being of such dimensions that they are capillary in their action, and a combustible liquid inclosed in the tubules of the envelope."

There can be no question that these claims disclose a new method of introducing a coagulant into the mixture, so as to produce a satisfactory framework of nitrocellulose dispersed throughout its contents. The defendants, however, take the position that here again Schaub is employing facts well known to workers in the art. The testimony tends to show the reaction which takes place when water is added to a collodion solution, containing alcohol. Upon the addition of water, the dissolving power of the alcohol, with reference to air, is reduced, and a portion of the air of the solution is released whereby small bubbles or cavities are formed in the liquid. At the same time there is precipitated around the particles of water a shell of gelantinized collodion. The bubbles are partly filled with air and partly with the liquid which by diffusion consists of alcohol and water. This reaction takes place, it is claimed, no matter how the water is applied and the defense therefore contends that Schaub made no new discovery when he found that he could produce a tubulous envelope of combustible material, or, in any event, that the only novelty in the claims is the particular tubular structure described, as distinguished from cavities of a different shape.

It is true, however, that, if the water is added gently to the surface of the liquid, and is not injected into the interior with some force, there will result a diffusion of a certain amount of the alcohol out of the solution which will not enter into the final solidified product. It was the injecting and squirting process devised by Schaub which made possible the beneficial product as now manufactured, for thereby the gelatinized framework was generally dispersed throughout the mixture, as were also the cavities containing the combustible liquid supported by the framework. This simple expedient was the last step which converted a possibility into practical success, and comprised a patentable invention.

Claims 3, 4, and 5 are therefore valid. Claims 4 and 5, respectively, involve the infusibility of the envelope and the capillary action of the tubules, both of which are sustained by the evidence.

The remaining claims 6 and 10, set out below, relate to the process. They are sufficiently descriptive of the process, and are sustained by the disclosures in the specifications.

The final question of importance in regard to the first Schaub patent is the charge of infringement. It is not denied that the solid alcohol of the defendants contains the same ingredients as Theroz. The only difference is in the proportions of the ingredients in Sterno as compared with the same ingredients in Theroz. Considerable effort was made both in the testimony and in the briefs to establish a comparison of percentages of ingredients in the two products; but an exact or even a substantially correct comparison is impossible, since neither the claims nor the specifications of the patents in suit give the percentages of all the materials employed. The percentages of the ingredients are of course not set out in the claim, for this would have been an unnecessary restriction, and particularly unwise, having regard to the subject-matter, because the materials of necessity are subject to considerable variation, and, in the manufacture of the product, the working out of batches of material is largely a matter of trial and experiment. The specification of the first Schaub patent states that approximately 46 parts of commercial methyl alcohol are used to dissolve approximately 4 parts of cellulose, and a sufficient quantity of commercial ethyl alcohol (usually about 12 parts), containing 5 to 10 per cent. water, is then added to bring the collodion to the desired viscosity. Finally the collodion is transformed into a solid jelly by the addition of more ethyl alcohol, but the amount of the addition is not prescribed.

Notwithstanding this omission, the defendants in their brief attempt to calculate the percentage of each of the ingredients, and this they do by omitting altogether from the calculation the amount of ethyl alcohol, which according to the specification not only plays an important part in the process but forms an important element in the final product. This inaccurate calculation is shown by the following table, the variations therein in the amounts of methyl alcohol and acetone being due to the fact that the estimates of the experts as to the amount of acetone to be found in commercial methyl alcohol range from 15 to 30 per cent.:

Nitrocellulose .......... 6.5 per cent.
Methyl alcohol.......... 71.5 to 82.5 per cent.
Acetone ............... 11 to 22 per cent.

No chemical analysis was offered in evidence as to the composition of Theroz, nor was there any testimony given as to the proportions of the ingredients actually used to supplement the information contained in the specification. Nevertheless the plaintiff in its brief offers a calculation which is apparently the work of its expert, made at the request of counsel after the close of the trial. Obviously it cannot be accepted, since it is not supported by the record, but it is given below to show the claim the plaintiff puts forth as to the composition of its product:

Nitrocellulose .......... 3 per cent.
Methyl alcohol.......... 32.5 to 37.5 per cent.
Acetone .............. 5.5 to 10 per cent.
Ethyl alcohol.......... 50 to 59 per cent.

The composition of Sterno is also a matter of dispute in the testimony. The conflicting estimates are shown by the following table:

|  | Plaintiff's Estimate | Defendants' Estimate |
|---|---|---|
| Nitrocellulose .. | 2.7 per cent. | 2.72 per cent. |
| Methyl alcohol.. | 14.88 per cent. | 3.84 per cent. |
| Acetone ....... | 6.3 per cent. | 1.6 per cent. |
| Ethyl alcohol... | 76.12 per cent. | 87.48 per cent. |
| Water ........ |  | 3.70 per cent. |
| Esters ........ |  | .50 per cent. |

Samples of the defendants' products were analyzed by competent experts employed on behalf of the plaintiff, and the weight of the evidence is in favor of the accuracy of their calculation. This conclusion is reached, not only because the plaintiff's experts were admittedly competent, but because the defendants made no attempt to analyze a sample purchased by the plaintiff, and offered no analysis of any other sample of the defendants' product. The defendants' calculation was based on certain batch records disclosed by the defendants' books which were accepted by the defendants' expert as correct, without any analysis of the materials. These records show that in 1923 the defendants used a formula of which the following example is typical: 765 gallons of specially denatured ethyl alcohol, 3 barrels of cotton, 800 barrels of dehydrated special denatured ethyl alcohol, and 25 gallons of methyl acetone. No witness was produced to testify as to the precise ingredients of these materials, but the defendants' expert, assuming that the ingredients were those customarily found in articles of this description, made the calculation above set out. Under these circumstances it is incumbent upon the court to find that the painstaking analysis made by the plaintiff's experts, a difficult but not impossible task, more nearly ascertains the components of Sterno than the looser method of the defendants.

So far as claim 1 of the first Schaub patent is concerned, which describes a fuel consisting of nitrocellulose, methyl alcohol, and ethyl alcohol, meaning, as shown by the specification, commercial methyl alcohol and commercial ethyl alcohol, the differences between the estimates of the experts are immaterial. The important constituents in the final product are the nitrocellulose framework and the combustible alcohol. The same framework is found in both the plaintiff's and defendants' product, and, although the proportions of methyl and ethyl alcohol vary in the two substances, this variation has no bearing upon the matter of infringement, for it is conceded that, for purposes of combustion, methyl alcohol and ethyl alcohol are substantial equivalents.

The infringement of the first claim of the first Schaub patent is therefore established, unless there is merit in the defendants' contention that they use a nitrocellulose, which is soluble in ethyl alcohol, and therefore does not come within the terms of claim 1, which specifies a cellulose having a nitrogen content which renders it soluble in methyl alcohol. When this question is considered, the significance of the calculation of the defendants, wherein they attempt to minimize the amount of acetone in Sterno, is realized. The importance of the acetone in this connection is its solvent power with regard to nitrocellulose. The plaintiff admits that in the manufacture of Theroz the cellulose is dissolved by reason of the small amount of acetone found in commercial methyl alcohol, and claims that the same reaction takes place in the manufacture of Sterno. This claim, however, is denied by the defendants who declare that the nitrocellulose used in making Sterno is of a special character, soluble in pure ethyl alcohol, without the addition of either methyl alcohol or acetone. There are certain statements in Worden, above referred to, and in Lunge's Researches on Nitrocellulose, to the effect that anhydrated ethyl alcohol is a solvent for certain nitrocelluloses, and defendants' expert testified that he had performed a laboratory experiment in which he dissolved the same kind of nitrocellulose, as is used in the manufacture of Sterno, by the addition of ethyl alcohol alone. However this may be, Sterno was not made in 1923 by dissolving nitrocellulose in ethyl alcohol alone, but, on the contrary, the dissolving liquid consisted, not merely of ethyl alcohol, but also of methyl alcohol containing a certain percentage of acetone. The presence of methyl alcohol and acetone was explained by the defendants on the ground that these substances were necessary

as denaturants in order to secure a denatured ethyl alcohol which would avoid the prohibitive tax on grain alcohol and the manufacture of a product in violation of the National Prohibition Law (Comp. St. § 10138¼ et seq.). But the stubborn fact remains that in actual practice the defendants used a mixture containing methyl alcohol and acetone, and, under these circumstances, the motive with which the materials were employed was of no importance. Moreover, when the batch records of the defendants were produced at the plaintiff's instance, it was shown much more clearly than had theretofore appeared from the testimony of defendants' expert, that the defendants, in the manufacture of their product, employed not only a sufficient quantity of denaturant to comply with the federal laws and regulations, but voluntarily added a certain amount of methyl acetate. This substance contains from 60 to 70 per cent. of acetone and a certain amount of methyl alcohol, and, when added in the proportions used by the defendants, doubles the acetone content ordinarily present in specially denatured ethyl alcohol. It is an activizing solvent by which the solvent power of both alcohols is increased.

Clearly this defense does not tend to show that the nitrocellulose of the defendants is not soluble in commercial methyl alcohol or is not an equivalent of the nitrocellulose used by the plaintiff. It therefore appears, not only that all the ingredients of the first claim of the first Schaub patent are found in the defendants' product, but that these ingredients perform the same functions. The changes in proportion do not affect the operative character of the composition, and it follows that the first claim of the first Schaub patent is infringed. Walker on Patents (5th Ed.) § 373.

When we come to consider product claims 3, 4, and 5 of the first Schaub patent, which relate to the structure of the final product, and also process claims 6 and 10, it is desirable first to describe at greater detail the nature of the process employed by the defendant companies. The testimony shows that during July, 1923, the method of manufacture was substantially as follows: Seven cans at a time were arranged in a circle beneath the openings or valves of a circular disk, through which the collodion was injected into the cans, filling them to a point one-half inch from the top. They were then carried by an automatic conveyor beneath the water injector. This device consisted of 7 brass disks, each containing 25 minute perforations, situated about three-fourths of an inch above the cans, and in that position water was injected under considerable force by means of a pump through the orifices in the disks into the cans. Obviously this process is quite similar in its physical aspect to that of Schaub already described, although in the case of Theroz, the tubulous arrangement is produced by passing the coagulating liquid, which contains both ethyl alcohol and water, under the pressure of gravity, through a circular disk containing some 220 tubes in the case of one exhibit, and 420 tubes in the case of another.

But the defendants contend that the claims of the patent show a specific orderly arrangement, designated as tubular, and that therefore the plaintiff is limited to a tubulous envelope which is not infringed by a different physical structure. It is asserted that, whereas under the patent the streams of collodion and coagulant fall in a predetermined orderly arrangement, which causes a tubular structure or result, the defendants pour water into the cans in a haphazard fashion, without reference to the manner in which it is inserted, or to the form of the cavities which it may produce. Microphotographs of sections of the finished product of each of the parties tend to show that the enveloping framework of nitrocellulose is more orderly in arrangement and more nearly tubular in the case of Theroz than in the case of Sterno. Nevertheless the purpose of the insertion of the water should be considered. When it is injected into the collodion in numerous streams, gelatinization quickly takes place, and the nitrocellulose framework is precipitated. Cavities are formed in the framework, and in these cavities, as well as in the pores of the cellulose, is found a mixture of the alcoholic fuel and the coagulant created by diffusion. The same processes and the same results occur in the case of both parties.

[4] The real inquiry, therefore, is whether Schaub has unnecessarily limited his claim to the tubulous arrangement specifically described, or whether the patent is entitled on this point to a range of equivalents which would include the structure employed by the defendants. The creation of a framework of nitrocellulose, containing cavities, in which, as in a sponge, the combustible liquid is retained, constitutes an important practical improvement in the art, and there is therefore no reason to deny to the patent a reasonably liberal construction. While the structure of Theroz is of a more orderly character, there is necessarily in the case of both products a certain jumbling or confusion of material which results when the two liquids are poured together, so that in fact the resemblances, as shown

by the photographs, are more marked than the differences. The evidence justifies the application of the well-known rule laid down in Winans v. Denmead, 56 U. S. (15 How.) 339, 14 L. Ed. 717, where the claim for a railroad car body in the form of a frustrum of a cone was held to be infringed by a car body in the form of an octagonal pyramid. It was there decided that, where form and substance are separable, and the whole substance of the patent may be embodied in a different form, it is the duty of courts to protect the inventor by looking through the form to the substance of the invention.

Claim 10 relates to the plaintiff's process, and is as follows:

"The process of producing artificial fuel which consists in dissolving in methyl alcohol cellulose having a nitrogen content which renders it soluble therein and solidifying the colloid so formed with ethyl alcohol."

According to this claim, the plaintiff dissolves the cellulose in methyl alcohol and acetone, and solidifies the colloid so formed with alcohol containing from 5 to 10 per cent. of water. The use of acetone and water is not shown in the claim, but the specification shows that commercial methyl alcohol, which contains acetone, and commercial ethyl alcohol, containing from 5 to 10 per cent. of water, are intended to be employed.

The Sterno process, according to defendants' expert, consists in the use of denatured anhydrated ethyl alcohol, as a solvent, and 95 per cent. ethyl alcohol (containing 5 per cent. of water), as a dilutant to adjust the condition of the mixture, and water as the precipitating agent. The discussion, which has already taken place, shows clearly that the mixture of ethyl alcohol, methyl alcohol, and acetone, which make up the solvent used in the Sterno process, is equivalent to the solvent, namely, methyl alcohol and acetone, which is used in the Theroz process. The coagulant, water, used alone in the Sterno process, is clearly within the breadth of the claim which in substance specifies water, together with ethyl alcohol, as a coagulant. In other words, the coagulant in the Sterno process is the full equivalent of that patent because it accomplishes the same result in substantially the same way. It follows that claim 10 is infringed by the Sterno process.

Claim 6 is as follows:

"The process of producing artificial fuel, which consists in dissolving in methyl alcohol cellulose having a nitrogen content which renders it soluble therein, bringing the colloid to the desired viscosity by the addition of ethyl alcohol and forming the colloid into a tubu-

lous mass and injecting ethyl alcohol into the tubules in the colloid."

The defendants also infringe this claim. The process thereof involves the same two steps which are set out in claim 10, namely the placing of the nitrocellulose in solution, and the solidification thereof by the injection of a coagulating liquid. In addition, claim 6 specifies that the colloid shall be brought to the desired viscosity by the addition of ethyl alcohol. The testimony of defendants' expert, referred to in the discussion of the infringement of claim 10, shows that in the Sterno process 95 per cent. ethyl alcohol is used as a dilutant to adjust the condition of the whole mixture. Manifestly it plays the same part as the addition of ethyl alcohol, specified in claim 6.

The second Schaub patent has the identical objects of invention disclosed in the first Schaub patent, namely, to produce an artificial fuel which may be easily ignited, is rich in heat units, produces a high heat, does not fuse while burning, and leaves a minimum of residue or ash when consumed. The specification states that approximately 4 parts of nitrocellulose are dissolved in approximately 46 parts of commercial methyl alcohol, and that the colloid is then solidified by the addition of water. The claims in issue are the first and third, as follows:

"1. An artificial fuel consisting of cellulose having a nitrogen content which renders it soluble in methyl alcohol, methyl alcohol and water."

"3. The process of producing artificial fuel which consists of dissolving in methyl alcohol cellulose having a nitrogen content which renders it soluble therein and solidifying the colloid so formed with water."

[5] It is noticeable that, although this application was filed on October 4, 1917, subsequent to the filing date of the first Schaub patent, both patents were granted on the same day, April 9, 1918. Obviously the discussion of patentable invention and infringement as heretofore had in regard to the first Schaub patent is applicable to this in most respects. The claim is made, however, that this patent is invalid in any event, having reference to the prior art as disclosed in the first Schaub patent. If the first Schaub patent were in the position of a prior invention by another patentee, the claim would be well founded, but as a matter of fact both are the inventions of the same person, and the claims of the second patent might well have been added as additional claims to the first. The substantial difference is that the use of ethyl alcohol in the first Schaub patent is omitted, and the coag-

ulating effect necessary to complete the product is furnished by the addition of water which was in fact the coagulating agent found in the ethyl alcohol in the first Schaub patent. Since the patentee is the same in both instances, the second Schaub patent is not invalidated by the application for the first. Deister Concentrator Co. v. Deister Machine Co. (C. C. A.) 263 F. 710. It is true in the case at bar, as in the case cited, that, although the claims in the second patent might have been joined with the claims of the first, no damage to the public resulted from their separate presentation, in view of their simultaneous issuance, and it is quite clear that no fraud was practiced or intended by the applicant. Century Electric Co. v. Westinghouse E. & Mfg. Co., 191 F. 352, 112 C. C. A. 8; Toledo Plate & Window Glass Co. v. Kawneer Mfg. Co., 237 F. 364, 150 C. C. A. 378. .

[6] The second Schaub patent is also infringed by the defendants' process. The product claim refers to nitrocellulose, methyl alcohol and water. The defendants' product includes the same substances, and in addition ethyl alcohol, but the addition of this ingredient to the ingredients specified in the claim does not avoid infringement. Walker on Patents, § 347. Moreover, it should be borne in mind that methyl alcohol and ethyl alcohol are recognized equivalents as fuel. Process claim 3 is also infringed, as is apparent from the discussion above in regard to the infringement of the process claims of the first Schaub patent.

[7] Minor objections of the defendants relate to the sufficiency of the specifications and to the ignorance of the inventor. The argument with regard to the sufficiency of the specifications is based largely upon the fact that the specifications of the Schaub patents call for a cellulose having a nitrogen content which renders it soluble in methyl alcohol, "preferably cellulose penta-nitrate." The evidence shows that cellulose penta-nitrate is a theoretical or laboratory product, unsuitable for the manufacture of solid alcohol. However, cellulose penta-nitrate is not mentioned in any claim in issue, all of which specify nitrocellulose soluble in methyl alcohol. This is a sufficient description, since it enables an operator to select the proper substance. The fact that certain of the claims specify cellulose penta-nitrate does not justify the court in giving the other claims the same meaning. Automatic Recording Safe Co. v. Burns, 231 F. 985, 146 C. C. A. 181. Nor does the fact that the specifications declare that cellulose penta-nitrate is preferable require that it be read

into the claims. Sewall v. Jones, 91 U. S 171–185, 23 L. Ed. 275. The defendants' expert himself conceded that the disclosures of the patent were sufficient, if addressed to one skilled in the art. Nothing more is required. Minerals Separation Co. v. Hyde, 242 U. S. 261–270, 37 S. Ct. 82, 61 L. Ed. 286.

[8] It is likewise unimportant that the inventor did not understand the reactions which took place in the course of his process, for it is well settled that a patentee need not understand the scientific principles underlying his invention. Diamond Rubber Company v. Consolidated Tire Company, 220 U. S. 435, 31 S. Ct. 444, 55 L. Ed. 527.

[9] Finally, the Brigham patent, which was applied for February 23, 1918, and granted August 26, 1919, is to be considered. Brigham was the attorney for Schaub in the applications for the first and second Schaub patents, and conducted the correspondence with the Patent Office. His patent differs from the Schaub patents only in that he omits methyl alcohol and specifies dehydrated ethyl alcohol, commercial ethyl alcohol, containing about 5 per cent. of water, acetone, and nitrocellulose as the constituents of the product. Eight parts of cellulose are dissolved in a mixture of 92 parts of dehydrated ethyl alcohol and 14 parts of acetone. Commercial ethyl alcohol, containing about 5 per cent. of water, is added until the colloid is brought to a certain degree of viscosity, and it is then solidified by the addition of water or commercial ethyl alcohol which contains a percentage of water. The process claims are substantially set out in this description of the process.

The defendants claim that Brigham's only contribution was the disclosure that the solution of nitrocellulose in alcohol depends upon the presence of acetone, and that this matter was well known to the art, and was specifically called to his attention by the citations of the patent examiner, as shown by the file wrapper. This position is well taken. The plaintiff, indeed, concedes that there is no novelty or invention in the Brigham patent, unless it was in the suggestion of the use of dehydrated ethyl alcohol. There is no doubt that the nitrocellulose was more readily dissolved by the use of dehydrated ethyl alcohol in connection with acetone than would have been the case with the use of ordinary commercial ethyl alcohol containing a certain percentage of water, but, as the foregoing references to the literature will show, the art was already familiar with the fact that certain nitrocelluloses were soluble in dehydrated ethyl alcohol and insoluble when water was

present. Taking into consideration these facts, and the further fact that the only practical method of manufacture of solid alcohol, containing the constituents specified in the Brigham patent, is that suggested in the first Schaub patent, it follows that Brigham disclosed nothing of value, and that his patent is invalid for lack of patentable invention.

A decree will be signed in accordance with this opinion.